**FMC CORPORATION, Appellee,**

v.

**The CITY OF GREENSBORO, Appellant.**

**No. 8859.**

United States Court of Appeals
Fourth Circuit.

Reargued Sept. 24, 1963.

Decided Jan. 14, 1964.

Louis Robertson, Arlington Heights, Ill., and Edward A. Haight, Chicago, Ill. (Darbo, Robertson & Vandenburgh, Arlington Heights, Ill., Welch Jordan and H. J. Elam, III, Greensboro, N. C., on brief), for appellant.

R. Howard Goldsmith, Chicago, Ill., (Thornton H. Brooks, Greensboro, N. C., Charles W. Ryan, Schneider, Dressler, Goldsmith & Clement, Chicago, Ill., and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge:

Because the defendant departs from the patented process at the very point where novelty is claimed, we find no infringement of the patent. We, therefore, do not consider the question of the validity of this process patent or the defendant's claim of its misuse. The infringement question is not understandable, however, without some reference to the prior art in the treatment of sewage sludge, the subject of the patent.

In plants for the disposal of sewage from municipal systems, the raw sewage is delivered first to settling basins or tanks, in which a large proportion of the water is separated from a remaining sludge which contains volatile solids which are odorous and offensive. Thereafter, the green sludge is usually subjected to treatment to further reduce its water content and to render the remaining solids inoffensive or even to produce useful filter cake. In this further treatment, the green sludge from the preliminary settling tanks is delivered to digesters, and it is the operation of such digesters with which we are concerned.

Under the prevailing practice of the early treatment plants, the sludge was delivered to an unheated digester containing some seed sludge in which there were active anaerobic bacteria which attack the volatile solids, producing as a byproduct a gas containing a high proportion of methane. Such digester gas is combustible and usable as a fuel. In such unheated digestion tanks, the digestion process required two or three months.

It was then found that heating the contents of the digester would speed up the digestion time and shorten the holding period in the digester to approximately thirty days.

Greensboro had such a system in operation from sometime in the 1930's. It had two large digester tanks. Within them, digested solids settled to the bottom leaving above it a layer of comparatively clear, supernatant liquor topped by a scum layer. At appropriate times, the supernatant liquor was drawn off while the digested solids, which were still suspended in enough water to be pumpable, were delivered to an elutriation tank. There, the digested sludge was

washed to remove its alkaline contents. The alkaline water from the elutriation tank was pumped off and the remaining, comparatively purified, sludge went to vacuum filters where it was converted into filter cake.

In more recent times, a number of experiments were made with the idea that digestion in the primary digester would be accelerated by stirring the contents. In commercial installations, propellers and other mechanical devices had been employed for that purpose. Two German patents were issued on processes of recirculation of methane containing digester gas for the purpose of accelerating the digestion process, and the second of those patents disclosed gas recirculation for the purpose of turning the contents of the digester, preventing the settling of solids and the separation of supernatant liquor until the mixed sludge entered a second compartment where, quiescent, the digested solids could settle and the supernatant liquor be separated.

Lamb and Klein, employees of Chicago Pump Company, a subsidiary of the plaintiff, filed a patent application disclosing the recirculation of digester gas, they having become convinced that the recirculation of the digester gas had a catalytic effect which accelerated the digestion process. In 1953, they filed a second application for a patent, the specifications of which required the circulation of a larger volume of digester gas in the center of the digestion tank, preferably near the bottom so that the diffused gas rising to the top would turn the contents of the tank, the contents in the center of the tank rising with the diffused gas, spreading outward at and near the surface and descending again near the outer walls of the tank. The result achieved was said to be a very effective mixing of the entire contents of the tank.

The Lamb and Klein applications were rejected on the basis of the German patents mentioned above and, after rejection, were abandoned.

There were other patents with which the District Court was much concerned, but we need not deal with them here since, on the question of infringement, we need only get to the patentee's point of departure. The second Lamb and Klein application was his point of departure.

The patent in suit is that of T. H. Forrest, No. 2,777,815, issued January 15, 1957, for a sewage digestion process. In 1953, Forrest was also an employee of Chicago Pump Company. He knew of the work of Lamb and Klein and worked with them, and his application was processed as copending with that of the second Lamb and Klein application. It disclosed everything that Lamb and Klein disclosed in their second application, but with the addition that the circulation of the diffused gas should be continuous and uninterrupted. Forrest, of course, disclaimed the acknowledged contributions of Lamb and Klein.

In the process disclosed by Lamb and Klein, when the digestion was completed, it was necessary to shut off the gas in order that solids might settle to the bottom from whence the digested solids might be drawn off while supernatant liquor might be drawn off from the higher level. Forrest thought that both unnecessary and objectionable. He thought it would be highly advantageous to combine everything that Lamb and Klein did with a continuous gas circulation so that, without supernating in the primary digester, digested sludge would be drawn off in its thoroughly mixed or homogenous state to a second tank, where, quiescent, the digested solids would be allowed to settle and the supernatant liquor to form above. Forrest thus sought a combination process patent, combining the circulation of diffused digester gas and the rotation of the contents of the digester to accelerate the digestion process, as disclosed by Lamb and Klein, with the further step of removing some of the well-mixed digested sludge from the digester without interruption of the flow of digester gas, and the separation of the digested solids from the supernatant liquor in a separate container into which the removed sludge is pumped.

Illustrative of the Forrest claims, is Claim 1 which is as follows:

"In the anaerobic digestion of sewage sludge, the improvement comprising the steps of continuously circulating methane—containing digester gas within an enclosed container containing sludge undergoing digestion to digest the sludge, removing at least a portion of the digested sludge from said container and introducing the same into a second container, and holding the digested sludge in said second container in a quiescent state to enable the digested solids to settle to the bottom thereof, the removal of the digested sludge from said first mentioned container being effected without interruption of the flow of digester gas within said first mentioned container."

In commercial installations following the teachings of the Forrest patent, adequate digestion may be accomplished in approximately ten days. Practice of the process can thus greatly increase the capacity of existing plants and reduce the requirement for large digestion tanks in new plants. The entire process is certainly a substantial improvement over the practices known twenty years earlier, though, since we deal only with the question of infringement, we need not now decide whether all or part of the advance may be attributed to the patentee, Forrest, or to Lamb and Klein and others who had been working in the field.

Walker Process Equipment, Inc. is a competitor of Chicago Pump Company. It had manufactured and sold mechanical mixing equipment for use in digesters, but, after it learned of Chicago Pump's use of digester gas to stir the contents of the digester, it turned to a "gas lifter." The gas lifter it produced is substantially different from that produced by Chicago Pump, but, when installed in the center of a digester, it clearly and effectively produces the desired result of turning the contents of the digester in rotary motions and thoroughly mixing them. Its installation at Greensboro does not extend so deep in the tank as Chicago Pump's installations, and it is not clear that, continuously operated, the solids content of the sludge at the bottom of the tank would not be much greater with Walker's installation than with Chicago Pump's, but effective and satisfactory digestion was obtained at a rate comparable to that of Chicago Pump's processes.

One of the disposal plants in the City of Greensboro, North Carolina, had become quite inadequate to handle the increased volume of sewage delivered to it. The City contemplated the construction of two new, large digestion tanks, but, when it learned of the new processes available to it, it sought bids from Chicago Pump, Walker Equipment, and others. It finally accepted the bid of Walker Equipment, which installed one of its gas lifters in one of the Greensboro digesters, and, later, a second lifter was installed in the second digester. Their operation so shortened the digestion period that the two digesters were able to handle all of the green sludge delivered to them and there was no further need to construct new digester tanks. No other change was made in the Greensboro equipment.

Because Walker Equipment sold the gas lifters to Greensboro and agreed at the time of sale to protect the City from patent claims, it has defended the City in this action.

While the Greensboro digesters have been operated effectively, in operation they have not followed the teaching of the Forrest patent that circulation of the gas should be continuous and should not be interrupted for supernating. At regular intervals, the gas circulation in the Greensboro digesters has been cut off, the digested solids allowed to settle to the bottom and the supernatant liquor allowed to form above. The supernatant liquor has then been drawn off directly from the digester, while settled solids at the bottom of the tank have been pumped to the elutriation tank just as they were before installation of the gas lifter.

Infringement is said to have been shown, however, because during a period beginning in November 1958 and ending in May 1960, on forty-one occasions on days scattered throughout the period, sludge from the bottom of a Greensboro digester was pumped to the elutriation tank when the gas lifter was operating. On those days, the plaintiff says that the City was practicing its patented process. It claims no infringement on those 176 days, scattered throughout the period, during which the gas lifter was shut off to permit supernating and the withdrawal of supernatant liquor and/or settled sludge from the bottom of the tank. It also claims infringement on those days on which there was no drawoff and during which the gas lifter operated continuously, but the District Court did not find infringement on those days.

From the foregoing, it is apparent that the operation of the Greensboro plant was quite contrary to the teaching of the Forrest patent at the very point of Forrest's claim of novelty. He disclaimed all that Lamb and Klein had in their applications. They taught the recirculation of digester gas at such a rate and in such volume as to turn and thoroughly mix the contents of the digester. They differed from Forrest only in that one practicing their process would shut down the gas lifter at appropriate times to supernate and draw off the supernatant liquor and/or digested sludge at the bottom of the tank. The Lamb and Klein process requires that the gas lifter be off in order to draw off supernatant liquor, for, as long as the contents of the tank are being mixed by the gas lifter, there is no supernatant layer. However, when the supernatant liquor is allowed to form in a layer to be drawn off, digested solids descend to the bottom of the tank and the water content of the entire tank is proportionately reduced. It was thus found at Greensboro that a drawoff of digested sludge from the bottom of the tank while the gas lifter was in operation was not impractical, for its solid content was much higher than that of the well-mixed sludge drawn off, without any

supernating, under the teachings of the Forrest patent, and it went directly to the elutriation unit just as the settled sludge in the quiescent tank always had. Indeed, on many days when the gas lifter was off, settled sludge was drawn from the bottom of the tank while supernatant liquor was being withdrawn from the top, and whether the bottom sludge was withdrawn when the gas lifter was in operation or not it went directly to the elutriation tank, and the record discloses no difference in its processing in the elutriation tank whether or not it had been drawn off while the gas lifter was in operation.

The plain and obvious fact is that Greensboro has followeed a consistent and systematic practice of shutting off the gas lifters for the purpose of supernating in the primary digestion tanks. This is precisely what Forrest says should not be done. His only claimed contribution is its avoidance. The accused process is the patentee's starting point. It does exactly what the patentee sought to improve and without following the patent's teaching that the process might be practiced more advantageously without shutting off the gas lifter for the purpose of supernating in the digester.

It may be that the equipment at Greensboro is capable of being operated in accordance with the teachings of the Forrest patent. That would be true if the elutriation tanks were capable of taking and effectively processing sludge of a much lower solid content and a much larger volume than they now handle. It could be adapted to the practice of the patented process by the interposition of a second tank for supernating. There are no apparatus claims, however. The Walker gas lifter employed by Greensboro infringes no patent. Its intermittent operation cannot infringe the Forrest patented process, for Forrest requires that its operation be continuous.

Since the Greensboro gas lifters are operated intermittently, being regularly shut off for the purpose of supernating in the digester, itself, the Greensboro

operation does not infringe the patented process which requires continuous operation of the gas lifter with no supernating in the digester.

Since we find no infringement, the judgment in favor of the patent owner must be reversed.

Reversed.